# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TELDIA R. BLEDSOE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05cv00052 |
| | ) | |
| | ) | **MEMORANDUM OPINION** |
| **JO ANNE B. BARNHART**, | ) | |
| Commissioner of Social Security, | ) | By: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Teldia R. Bledsoe, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence has been defined as "evidence which a reasoning mind

-1-

Case 2:05-cv-00052-PMS   Document 13   Filed 10/02/06   Page 1 of 20   Pageid#: 67

would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bledsoe protectively filed her application for DIB on or about October 14, 2003, alleging disability as of October 13, 2003, based on carpal tunnel syndrome in the right hand, problems with the right arm, arthritis in the back, shoulder, hip and knee pain and a nervous condition. (Record, ("R.") at 60-63, 77,103.) The claim was denied initially and upon reconsideration. (R. at 46-48, 51, 52-54.) Bledsoe then requested a hearing before an administrative law judge, ("ALJ"). (R. at 55-56.) The ALJ held a hearing on January 18, 2005, at which Bledsoe was represented by counsel. (R. at 24-43.)

By decision dated February 7, 2005, the ALJ denied Bledsoe's claim. (R. at 13-19.) The ALJ found that Bledsoe met the disability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 18.) The ALJ found that Bledsoe had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 18.) The ALJ found that Bledsoe suffered from severe impairments, namely degenerative disc disease, carpal tunnel syndrome of the right hand, a depressive disorder and an anxiety disorder, but he found that Bledsoe did not suffer from an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that

Bledsoe's allegations were not totally credible. (R. at 18.) The ALJ found that Bledsoe retained the functional capacity to perform simple, unskilled, low-stress light work[1] that did not require repetitive use of the right hand. (R. at 19.) Thus, the ALJ found that Bledsoe could not perform any of her past relevant work. (R. at 19.) Based on Bledsoe's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Bledsoe could perform jobs existing in significant numbers in the national economy, including those of a hostess, a ticket clerk, a parking lot attendant, a flagger and a taxi/bus driver. (R. at 19.) Thus, the ALJ concluded that Bledsoe was not under a disability as defined in the Act and was not eligible for benefits. (R. at 19.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued his decision, Bledsoe pursued her administrative appeals, (R. at 8), but the Appeals Council denied her request for review. (R. at 3-7.) Bledsoe then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2006). The case is before this court on Bledsoe's motion for summary judgment filed on March 8, 2006, and on the Commissioner's motion for summary judgment filed April 6, 2006.

## *II. Facts*

Bledsoe was born in 1965, (R. at 27, 60), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). Bledsoe has a high school education and past

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2006).

-3-

relevant work experience as a sewing machine operator, a cook, a receptionist and a custodian. (R. at 71, 74.)

At her hearing, Bledsoe testified that she had to stop working in October 2003 as an elementary school custodian after hurting her back lifting a heavy desk. (R. at 31.) She stated that although she had a driver's license, she rarely drove because doing so made her nervous and panicky. (R. at 32.) Bledsoe testified that she had been depressed since she stopped working. (R. at 33-34.) She stated that she was taking medication for her depression. (R. at 33-34.) Bledsoe stated that she did not associate with anyone. (R. at 35.) She testified that she was not receiving mental health counseling and that it had not been suggested to her. (R. at 35.) Bledsoe stated that she panicked and did not want to associate with others. (R. at 38.) She stated that she attended church in the past, but lost interest. (R. at 38.) Bledsoe testified that she used to have friends with whom she associated, but she had stopped talking with them. (R. at 38-39.) She stated that she had crying spells approximately three to four times each day, which lasted from 10 to 15 minutes each. (R. at 39.) She stated that these crying spells were precipitated by her pain. (R. at 39.)

Kathy Sanders, a vocational expert, testified at Bledsoe's hearing. (R. at 40-42.) Sanders classified Bledsoe's work as a sewing machine operator as semi-skilled medium work.[2] (R. at 41.) She classified Bledsoe's work as a custodian as semi-

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2006).

-4-

skilled and heavy.[3] (R. at 41.) Sanders classified Bledsoe's work as a receptionist as semi-skilled light work. (R. at 41.) Finally, Sanders classified Bledsoe's work as a cook as medium and semi-skilled. (R. at 41.)

Sanders testified that an individual of Bledsoe's age, education and work history and who was restricted to simple, unskilled, low-stress, light work, but who could not repetitively use the dominant right hand, could perform jobs existing in significant numbers in the national economy, including those of a restaurant hostess, a ticket clerk, a parking lot attendant, a flagger and a taxi/bus driver. (R. at 41.) Sanders was next asked to consider the same hypothetical individual, but who experienced pain that frequently interfered with her ability to concentrate or persist at work tasks. (R. at 42.) Sanders testified that such an individual could not perform any jobs. (R. at 42.)

In rendering his decision, the ALJ reviewed records from Lee Regional Medical Center; Wellmont Holston Valley Medical Center; Dr. Jai Varandani, M.D.; Dr. Nathan E. Doctry, M.D.; Joseph Leizer, Ph.D., a state agency psychologist; William E. Stanley, M.Ed., a licensed psychological examiner; R. J. Milan Jr., Ph.D., a state agency psychologist; Dr. H. Schultz, M.D.; Rebecca Mullins, FNP; Dr. Donald R. Williams, M.D., a state agency physician; Dr. Randall Hays, M.D., a state agency physician; William E. Stanley, M.Ed., a licensed senior psychological examiner; Donald Hiers, Ph.D., a licensed clinical psychologist; Dr. Patrick Molony, M.D.; and Dr. Jeffery J. France, M.D.

---

[3]Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, she also can do medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2006).

-5-

Case 2:05-cv-00052-PMS   Document 13   Filed 10/02/06   Page 5 of 20   Pageid#: 71

Bledsoe was seen at Dryden Clinic by Rebecca Mullins, a family nurse practitioner for Dr. H. Schultz, M.D., from December 2001 to September 2003. (R. at 111-16, 166-67.) On December 21, 2001, Bledsoe was diagnosed with hypertension, rheumatoid arthritis and hypercholesterolemia. (R. at 166.) She was prescribed Naprosyn and was referred to a rheumatologist. (R. at 166.) On January 18, 2002, Bledsoe reported that Naprosyn helped control her pain and that her blood pressure had been good. (R. at 116.) Bledsoe further reported that she was dieting and exercising. (R. at 116.) Her diagnoses remained the same. (R. at 116.) Mullins prescribed Maxzide. (R. at 116.) On August 22, 2002, Bledsoe complained of occasional chest pain. (R. at 115.) She was diagnosed with dyslipidemia and occasional chest pain. (R. at 115.) Bledsoe was referred to The Heart Center and her dosage of Maxzide was increased. (R. at 115.) Later that month, Bledsoe was prescribed Avalide. (R. at 114.) On April 4, 2003, Bledsoe was prescribed Celebrex and Naprosyn was discontinued because Bledsoe stated that it no longer helped her joint pain. (R. at 113.) She was diagnosed with osteoarthritis. (R. at 113.) On July 11, 2003, Bledsoe reported difficulty sleeping, but her blood pressure was better stabilized. (R. at 112.) Bledsoe's chief complaint at that time was joint and muscle pain in the mornings. (R. at 112.) She also noted some pain in the right wrist with occasional numbness. (R. at 112.) A physical examination revealed some tender point sites on the lower aspects of the cervical spine, bilaterally at the C5, C6 and C7 disc spaces, on the trapezius bilaterally, on the second rib bilaterally, on the lateral epicondyle bilaterally and on the knees bilaterally. (R. at 112.) Bledsoe was diagnosed with fibromyalgia and carpal tunnel of the right arm. (R. at 112.) Mullins referred Bledsoe to Dr. Doctry for a carpal tunnel evaluation and to a rheumatologist for a fibromyalgia evaluation. (R. at 112.) She was prescribed Celexa. (R. at 112.)

On September 19, 2003, Bledsoe complained of headaches and dizziness. (R. at 111.) She further noted some depression. (R. at 111.) Bledsoe reported that Celexa did not help her condition. (R. at 111.) Bledsoe stated that Dr. Doctry had prescribed Lortab for her carpal tunnel and back problems. (R. at 111.) A CT scan of the head was scheduled for later that month. (R. at 111.) Mullins diagnosed cephalagia and depression. (R. at 111.) She prescribed Wellbutrin. (R. at 111.)

Bledsoe was seen by Dr. Nathan Doctry, M.D., from July 2003 though October 2003. (R. at 124-27.) He reported that Bledsoe was having problems using her right hand and shoulder. (R. at 127.) On July 24, 2003, Dr. Doctry diagnosed Bledsoe with carpal tunnel syndrome and right acromioclavicular, ("AC"), joint syndrome. (R. at 127.) However, Dr. Doctry noted that Bledsoe's range of motion was excellent. (R. at 127.) In September 2003, Bledsoe reported that she was experiencing demotivation with accompanied ceased church attendance, tiredness and an inability to cope. (R. at 125-26.) Dr. Doctry diagnosed carpal tunnel syndrome and lumbar spine radiculitis. (R. at 126.) He noted that Bledsoe might need a decompression for her carpal tunnel syndrome. (R. at 126.) On October 13, 2003, Dr. Doctry prescribed Lortab for pain. (R. at 124.) He diagnosed Bledsoe with mild lumbar spine disease and recommended a decompression for Bledsoe's carpal tunnel syndrome. (R. at 124.) Dr. Doctry noted that there was no disability at that time. (R. at 124.) MRIs and x-rays were conducted during this time. (R. at 128-30.) An x-ray of the right shoulder showed mild osteoarthritis at the right AC joint. (R. at 130.) An MRI of the lumbar spine showed degenerative change with mild disc bulging at the L-4/L-5 disc level. (R. at 129.) Very minimal scoliosis was noted on the left side of the lumbar spine. (R. at 128.) X-rays showed no fractures or compression, and all disc spaces were within normal range. (R.

at 128.)

A Psychiatric Review Technique form, ("PRTF"), was completed by Joseph Leizer, Ph.D., a state agency psychologist, on February 10, 2004. (R. at 150-65.) Bledsoe was diagnosed with a nonsevere depressive disorder, not otherwise specified. (R. at 150, 153.) The evaluation noted no limitations in activities of daily living, no difficulty in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and no extended episodes of decompensation. (R. at 160.) Leizer concluded that Bledsoe did not appear to be significantly limited due to psychiatric factors and should be able to perform all levels of work. (R. at 165.) He noted that her allegations were not fully credible. (R. at 165.) These findings were affirmed by R. J. Milan Jr., Ph.D., another state agency psychologist, on April 2, 2004. (R. at 150.)

Bledsoe saw Dr. Jai Varandani, M.D., from October 2003 through March 2004, (R. at 133-39), for a pinched nerve, chronic shoulder pain, swelling and pain in both the hip and knee, stiffness, muscle tenderness, chest and back pain and asthma. (R. at 133-35, 137.) During this time, Bledsoe continued her medications, including Tylox, Bextra, Zocor, Avalide and Wellbutrin. (R. at 133-37.) On October 20, 2003, Bledsoe's right knee was slightly tender, but not swollen. (R. at 136.) He noted that Bledsoe's left hip was slightly tender, and she had mild lumbar spine tenderness. (R. at 136.) Later that month, Bledsoe reported that she was feeling better. (R. at 136.) An X-ray of Bledsoe's right knee in October 2003 showed no dislocations or fractures. (R. at 139.) On November 20, 2003, Dr. Varandani noted tenderness of the right gluteal area. (R. at 135.) Straight leg raising was negative and there was no vascular

-8-

Case 2:05-cv-00052-PMS   Document 13   Filed 10/02/06   Page 8 of 20   Pageid#: 74

compromise. (R. at 135.) Dr. Varandani further noted mild to moderate lumbar spine tenderness. (R. at 135.) X-rays of Bledsoe's right hip showed no abnormalities, and x-rays of the lumbar spine showed only mild to moderate osteophytic changes. (R. at 138.) On December 18, 2003, Bledsoe continued to complain of pain in the right gluteal area. (R. at 135.) By January 22, 2004, Bledsoe stated that she was feeling better. (R. at 134.) Dr. Varandani noted mild lumbar spine and trapezius muscle tenderness. (R. at 134.) On February 23, 2004, Bledsoe noted that she had been feeling "stiffer and stiffer." (R. at 134.) However, she further noted that her prescription medication had run out. (R. at 134.) On March 23, 2004, Bledsoe again reported feeling better. (R. at 133.) Tests indicated that Bledsoe had high blood pressure and high cholesterol. (R. at 133, 136.)

On February 9, 2004, Dr. Donald R. Williams, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment finding that Bledsoe could perform light work diminished by a limited ability to push and/or pull with her upper extremities. (R. at 142-49.) Dr. Williams found that Bledsoe could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 145.) He further found that she could never climb ladders, ropes or scaffolds. (R. at 145.) Dr. Williams found that Bledsoe was limited in her abilities to reach and to handle objects in the right upper extremity. (R. at 145.) Dr. Williams imposed no visual or communicative limitations. (R. at 146.) He concluded that Bledsoe should avoid all exposure to work hazards. (R. at 147.) Dr. Williams found Bledsoe's statements partially credible. (R. at 148.) These findings were affirmed by Dr. Randall Hays, M.D., another state agency physician, on April 2, 2004. (R. at 149.)

A psychological evaluation of Bledsoe was performed by William E. Stanley, M.Ed., a licensed senior psychological examiner, and Donald Hiers, Ph.D., a licensed clinical psychologist with the Virginia Department of Rehabilitative Services, on August 14, 2004. (R. at 172-77.) It was noted that Bledsoe exhibited awkwardness in gross motor movement as she walked due to an apparent back injury, as well as hip and leg pain. (R. at 172.) Bledsoe generally understood instructions and was appropriately persistent in assessment tasks. (R. at 172-73.) However she exhibited erratic or variable concentration. (R. at 172.) It was noted that Bledsoe was alert and fully oriented. (R. at 173.) Stanley and Hiers noted that Bledsoe appeared to be of low average intellectual functioning. (R. at 174.) They further noted that Bledsoe appeared depressed and anxious. (R. at 174.) Clinical symptoms included poor sleep, irritability, loss of interest, social isolation, anxiety, poor anger control, fear of crowds, memory difficulty, crying spells and feelings of helplessness. (R. at 174.) It also was noted that Bledsoe had adequate social skills and ability to relate. (R. at 174.) Bledsoe reported an ability to perform light household chores with rest breaks. (R. at 174.)

A Personality Assessment Inventory, ("PAI"), was given to Bledsoe. (R. at 175.) The negative impression indicated some level of exaggeration. (R. at 175.) Therefore, Stanley and Hiers noted that interpretation of the scales should be taken with caution. (R. at 175.) However, Stanley and Hiers indicated that they believed that Bledsoe had mental health issues, but not at the level of severity indicated by the PAI scores. (R. at 175.) It was suggested that Bledsoe become involved in psychotherapy and medication treatment supervised by someone other than her primary care physician. (R. at 175.) Bledsoe was diagnosed with a mild to moderate depressive disorder, not otherwise specified, a mild to moderate generalized anxiety disorder,

mild to moderate memory impairment, low average intellectual functioning and a then-current Global Assessment of Functioning, ("GAF"), score of 50-55.[4] (R. at 175.) It also was noted that Bledsoe's work-related activities would be affected by limitations on her ability to understand and remember, to maintain concentration and to persist, to maintain appropriate social interaction and to adapt to changes. (R. at 176.)

Bledsoe saw her primary care physician, Dr. Patrick A. Molony, M.D., from June 2004 to January 2005. (R. at 183-85, 210.) Dr. Molony saw Bledsoe for left back pain, eye swelling, high cholesterol and high blood pressure, carpal tunnel syndrome of the right hand, right shoulder pain and right hip pain. (R. at 183-85, 210.) A physical examination on June 6, 2004, revealed no edema of the extremities. (R. at 184.) The following month, Dr. Molony again noted no edema in the extremities. (R. at 184.) However, Bledsoe's cholesterol was elevated, and Dr. Molony increased her dosage of Zocor. (R. at 184.) Dr. Molony noted that Bledsoe would attempt to regulate her blood sugar levels through diet. (R. at 184.) She was diagnosed with back pain of the lumbar spine, carpal tunnel syndrome of the right hand, right shoulder pain, noninsulin dependent diabetes mellitus and hypercholesterolemia. (R. at 183-84.) On October 15, 2004, Bledsoe complained of arthritis of the back, right hip and right shoulder. (R. at 183.) She exhibited no edema of the extremities. (R. at 183.) Dr.

---

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41 to 50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning. ..." DSM-IV at 32. A GAF of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning. ..." DSM-IV at 32.

Molony switched Bledsoe from Bextra to Naprosyn. (R. at 183.) She was diagnosed with back pain of the lumbar spine, degenerative disc disease, arthritis, right hip and right shoulder pain, diabetes mellitus and hypercholesterolemia. (R. at 183.) On January 14, 2005, Bledsoe continued to complain of back and shoulder pain. (R. at 210.) Her diagnoses remained the same with the addition of neck pain. (R. at 210.) Her medications remained the same. (R. at 210.) Bledsoe was referred to Dr. France. (R. at 210.)

Bledsoe saw Dr. Jeffery France, M.D., on January 28, 2005, with complaints of shoulder pain, hip pain, back pain and carpal tunnel syndrome. (R. at 204.) A physical examination revealed a positive Spurling sign,[5] a normal, but mildly antalgic gait, full range of motion of the right shoulder with positive impingement, full strength, 2+ pulses, full range of motion of the left upper extremity with full strength, 2+ pulses and intact neurovascular functioning and full range of motion of both lower extremities with full strength, normal stability, 2= pulses and intact neurovascular functioning with +/- radicular symptoms. (R. at 204.) Dr. France recommended an electromyogram, ("EMG"), and a nerve conduction study of the right upper extremity. (R. at 204.) He also planned to assess Bledsoe further for a possible rotator cuff tear. (R. at 204.) Dr. France further noted the possibility of referring Bledsoe to a rheumatologist. (R. at 204.) Dr. France advised Bledsoe to continue sleeping in a wrist splint. (R. at 204.) He gave her a Medrol dosepak. (R. at 204.)

---

[5]A positive Spurling sign is indicative of cervical radiculopathy. During a Spurling maneuver, the patient laterally bends the neck to each side while maintaining a posture of cervical extension. Pain intensified with ipsilateral bending strongly suggests a diagnosis of radiculopathy. Pain with contralateral bending suggests a musculoligamentous origin. *See* http://www.med.ufl.edu/rheumTests.htm#spurling.

Case 2:05-cv-00052-PMS   Document 13   Filed 10/02/06   Page 12 of 20   Pageid#: 78

On February 4, 2005, Bledsoe underwent an EMG of the right upper extremity and a nerve conduction study. (R. at 199-200.) The EMG revealed mild right median mononeuropathy across the wrist consistent with carpal tunnel syndrome. (R. at 200.) Bledsoe saw Dr. France on February 14, 2005, at which time he recommended that she undergo an arthroscopic rotator cuff repair and subacromial decompression with distal clavicle excision. (R. at 203.)

On March 16, 2005, Bledsoe underwent arthroscopic surgery on her right shoulder by Dr. France to repair a full thickness nonretracted rotator cuff tear. (R. at 196-98.) After the operation, Dr. France noted that the rotator cuff tear was significantly smaller than expected and that the repairs were easily made. (R. at 198.) On March 18, 2005, Dr. France wrote an order for Bledsoe to begin physical therapy. (R. at 202.) In April 2005, Dr. France noted that Bledsoe was doing relatively well after the operation and showed only slight swelling of the hands. (R. at 201.) Dr. France further noted that Bledsoe had good range of motion of the shoulder. (R. at 201.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can

-13-

perform other work.  *See* 20 C.F.R. § 404.1520 (2006).  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical

-14-

evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

By decision dated February 7, 2005, the ALJ denied Bledsoe's claim. (R. at 13-19.) The ALJ found that Bledsoe met the disability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 18.) The ALJ found that Bledsoe had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 18.) The ALJ found that Bledsoe suffered from severe impairments, namely degenerative disc disease, carpal tunnel syndrome of the right hand, a depressive disorder and an anxiety disorder, but he found that Bledsoe did not suffer from an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that Bledsoe's allegations were not totally credible. (R. at 18.) The ALJ found that Bledsoe retained the functional capacity to perform simple, unskilled, low-stress light work that did not require repetitive use of the right hand. (R. at 19.) Thus, the ALJ found that Bledsoe could not perform any of her past relevant work. (R. at 19.) Based on Bledsoe's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Bledsoe could perform jobs existing in significant numbers in the national economy, including those of a hostess, a ticket clerk, a parking lot attendant, a flagger and a taxi/bus driver. (R. at 19.) Thus,

the ALJ concluded that Bledsoe was not under a disability as defined in the Act and was not eligible for benefits. (R. at 19.) *See* 20 C.F.R. § 404.1520(g) (2006).

In her brief, Blevins argues that the ALJ erred by failing to find that her impairments met or equaled the requirements in listing § 12.04. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 5-8.) Blevins also argues that the ALJ erred by failing accept the findings of psychologist Hiers regarding the severity of her mental impairments and their impact on her ability to work. (Plaintiff's Brief at 8-10.)

Bledsoe does not contest the Commissioner's finding as to her physical residual functional capacity. Nor does she challenge the Commissioner's finding that other jobs existed that she could perform, if her residual functional capacity was as found by the Commissioner.

Bledsoe argues that the ALJ erred by failing to find that her depression met the medical listing. I disagree. The qualifying criteria for the listed impairment for depression is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04. To meet the requirements of this section, a claimant must show that she suffers from at least four of the listed symptoms of depressive syndrome, which result in at least two of the following:
    a.    Marked restriction of activities of daily living;
    b.    Marked difficulties in maintaining social functioning;
    c.    Marked difficulties in maintaining concentration, persistence, or pace; or

      d.      Repeated episodes of decompensation, each of extended duration.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A)(1), 12.04(B) (2006). A claimant also may meet the requirements of this section if she has a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activities. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C) (2006). Based on my review of the record, I find no evidence from any psychological or psychiatric source stating that Bledsoe's depression met these criteria. I first note that Bledsoe has not seen any mental health source for treatment or counseling. Instead, the record reveals that she first complained of depression to Mullins in July 2003, at which time she was prescribed Celexa. (R. at 112.) In September 2003, when Bledsoe reported that Celexa did not help her condition, Mullins prescribed Wellbutrin. (R. at 111.) During the time period that Bledsoe saw Mullins, from December 2001 through September 2003, Mullins did not impose any limitations on Bledsoe's work-related mental abilities. In September 2003, Bledsoe reported to Dr. Doctry demotivation with accompanied ceased church attendance, fatigue and an inability to cope. (R. at 125-26.) Dr. Doctry made no mental diagnosis, prescribed no additional medications and placed no restrictions on Bledsoe's work-related mental abilities. State agency psychologist Leizer completed a PRTF in February 2004, later affirmed by state agency psychologist Milan, finding that Bledsoe suffered from a nonsevere affective disorder, not otherwise specified. (R. at 150-65.) He found no limitations in activities of daily living, no difficulties maintaining social functioning, only mild difficulty concentrating, persisting and keeping pace and no episodes of decompensation. (R. at 160.) Leizer concluded that Bledsoe did not appear significantly limited by

Case 2:05-cv-00052-PMS   Document 13   Filed 10/02/06   Page 17 of 20   Pageid#: 83

psychiatric factors, and he opined that she should be able to perform all levels of work. (R. at 165.) Leizer found Bledsoe's allegations not fully credible. (R. at 165.) Moreover, although Bledsoe saw Dr. Varandani from October 2003 through March 2004, she made no complaints of depression. Although Bledsoe refers to Dr. Molony as her treating physician, whom she saw from June 2004 through January 2005, she never complained of depression to him. In August 2004, Stanley and Hiers noted that Bledsoe exhibited erratic or variable concentration. (R. at 172.) They diagnosed her with a mild to moderate depressive disorder, not otherwise specified, a mild to moderate generalized anxiety disorder, mild to moderate memory impairment, low average intellectual functioning and a then-current GAF score of 50 to 55. (R. at 175.) Stanley and Hiers opined that Bledsoe's work-related activities would be affected by limitations in the ability to understand and remember, to maintain concentration and to persist, to maintain appropriate social interaction and to adapt to changes. (R. at 176.) They suggested that Bledsoe begin psychotherapy and medication treatment by someone other than her primary care physician. (R. at 175.) However, for the following reasons, I find that the ALJ properly rejected the findings and opinions of Stanley and Hiers.[6]

As the ALJ noted, despite Stanley's and Hiers's finding that Bledsoe's work-related abilities would be affected by limitations in her abilities to understand and remember, to maintain concentration and to persist, to maintain appropriate social interaction and to adapt to changes, in their narrative report, they stated that Bledsoe generally understood and was appropriately persistent in assessment tasks. (R. at 172-

---

[6]The ALJ improperly refers to Hiers as "Harris." (R. at 15-16.) I note this discrepancy only for clarity of the record.

Case 2:05-cv-00052-PMS   Document 13   Filed 10/02/06   Page 18 of 20   Pageid#: 84

73.) They further noted in their narrative that Bledsoe had adequate social skills and ability to relate. (R. at 174.) Finally, I note that Stanley and Hiers themselves stated that the PAI indicated that Bledsoe was exaggerating her problems. (R. at 175.) Thus, I find that the ALJ correctly determined that Stanley's and Hiers's findings are inconsistent with their own narrative report. Moreover, I further find that Stanley's and Hiers's findings are not supported by the other medical evidence of record as a whole.

Thus, I find that the evidence of record shows that Bledsoe's depression does not result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in concentration, persistence or pace; or (4) repeated episodes of decompensation. Instead, for all the reasons cited above, I find that ALJ's findings that Bledsoe suffered from mild restrictions in activities of daily living, mild to moderate difficulties in maintaining social functioning and mild to moderate difficulties in maintaining concentration, persistence or pace are supported by substantial evidence. (R. at 16.) I further note that the record supports a finding that Bledsoe has experienced no episodes of decompensation. Thus, I find that substantial evidence supports the ALJ's failure to find that Bledsoe's mental impairments met or equaled the requirements of § 12.04.

### IV. Conclusion

For the foregoing reasons, Bledsoe's motion for summary judgment will be

denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED: This 2nd day of October 2006.

/s/ Pamela Meade Sargent
UNITED STATES MAGISTRATE JUDGE

-20-